MARCONI WIRELESS TELEGRAPH CO. v. KILBOURNE &
CLARK MFG. CO.

(District Court, W. D. Washington, N. D.   December 11, 1916.)

No. 71.

1. PATENTS ⊚═◯328—VALIDITY AND INFRINGEMENT—WIRELESS TELEGRAPH AP-
PARATUS.
   The Lodge patent, No. 609,154, for improvements in wireless telegraphy,
   *held* valid and infringed.

2. PATENTS ⊚═◯328—VALIDITY AND INFRINGEMENT—SYSTEM OF WIRELESS TE-
LEGRAPHY.
   The Marconi patent, No. 763,772, for a system of wireless telegraphy, in
   which the transmitting station and the receiving station each contains
   an oscillation transformer, consisting of an open and a closed circuit, the
   two circuits at each station being in electrical resonance with each other,
   and in electrical resonance with the circuits at the other station, the ob-
   ject being to provide means whereby electric waves from a transmitting
   station may, when desired, be localized at any one or more selected re-
   ceiving stations out of a group of receiving stations, construed, and *held*
   not infringed.

3. PATENTS ⊚═◯241—INFRINGEMENT—INDENTITY OF RESULTS.
   Infringement cannot be predicated on results obtained, irrespective of
   the mechanical apparatus employed.

   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 380; Dec. Dig.
   ⊚═◯241.]

In Equity.   Suit by the Marconi Wireless Telegraph Company
against the Kilbourne & Clark Manufacturing Company.   On final
hearing.   Decree for complainant, and in part for defendant.

L. F. H. Betts, of New York City, E. C. Hughes, of Seattle, Wash.,
James J. Cosgrove, of New York City, and Peters & Powell, of Seat-
tle, Wash., for plaintiff.

Philip Farnsworth, of New York City, and E. L. Skeel and Don-
worth & Todd, all of Seattle, Wash., for defendant.

NETERER, District Judge.   The plaintiff alleges infringement of
two letters patent, No. 609,154, issued August 16, 1898, to Lodge, and
No. 763,772, issued June 28, 1904, to Marconi, and each held by com-
plainant.   Defendant denies infringement, and alleges that the claims
made by Lodge and Marconi were patented prior to the Lodge and
the later Marconi invention or discovery, by the issuance of patents to
Marconi, Pupin, Tesla, Fessenden, and various other patentees.   The
record in this case is very voluminous, and many phases of the elec-
trical art have been exploited.   The courtroom was converted into a
laboratory.   The electrical apparatus was set up and operated in the
laboratory of the defendants.   Demonstrations were made at the Seat-
tle office of the complainant, and likewise in the laboratory of the Uni-
versity of Washington.   Demonstrations were made of plaintiff's ap-
paratus, and of the Lodge patent, of the Tesla patent, and defendant's
apparatus, and messages transmitted to and received from a station at
the Navy Yard, Bremerton, Wash.   Renowned physicists have tes-

⊚═◯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tified for days, and have unfolded to the court the principle upon which and theory by which the various appliances are operated. Notwithstanding the voluminous record in this case, the issues of fact are few, and, aside from the history of the prior art, would make a limited record.

[1] It will not be necessary, in view of the very full history of the prior art set forth by Judge Townsend, in Marconi v. De Forest (C. C.) 138 Fed. 657, and Judge Veeder, in Marconi Wireless Telegraph Co. v. National Electric Signal Co. (D. C.) 213 Fed. 815, to review the prior art, except as it may have relation to resonance, and double circuit tuning of the transmitting and receiving apparatus. Since the commencement of this action, the Lodge patent has expired. This patent has been repeatedly adjudicated, and without further discussion, and without passing upon the merits, I think we may say that further inquiry as to its validity is not demanded. It is conceded that, if the Lodge patent is valid, it has been infringed.

[2] Defendant claims to use the principles and fundamental apparatus of the first Marconi, 1896, patent, expired, and Lodge patent, expired, and the high spark frequency suggested by Professor Pupin, in 1899. Marconi uses Hertz oscillations or electric waves, and in the specifications of his patent, No. 763,772, says he has "invented certain new and useful improvements in apparatus for wireless telegraphy," which—

"relate to apparatus for communicating electrical signals without wires and by means of Hertz oscillations or electric waves. The object of the invention is to increase the efficiency of the system and to provide new and simple means whereby oscillations or electric waves from a transmitting station may be localized when desired at any one selected receiving station or stations out of a group of several receiving stations," and "to provide a transmitter which by suitable adjustment will, as the patent states, localize or select any desired receiving station. In other words, the waves radiated from such a transmitter will affect only a single desired receiving station out of a number of different and distant receiving stations. According to the present invention, the system includes at the transmitting station the combination, with an oscillation transformer of a kind suitable for the transformation of very rapidly alternating currents, of a persistent oscillator, and a good radiator, one coil of said transformer being connected between the aerial wire or plate and the connection thereof to earth, while the other coil of the transformer is connected in circuit with a condenser, a producer of Hertzian oscillations or electric waves shown in the form of a spark producer, and an induction coil (constituting the persistent oscillator) controlled by a signaling instrument,"

—the term "persistent oscillator" being:

"An electrical circuit of such a character that, if electromotive force is suddenly applied to it and the current then cut off, electrical oscillations are then set up in the circuit which persist or are maintained for a long time."

And a good radiator:

"An electrical circuit which quickly imparts the energy of electrical oscillations to the surrounding ether in the form of waves, being rapidly radiated in the form of electric waves by the electric conductor, the approximately closed circuit of the primary being a good conserver, and the open circuit of the secondary being a good radiator of wave energy."

The patent also provides:

"At the receiving stations employing my present invention I prefer to use a receiver such as those described in my several United States patents, Nos. 586,193, 627,650, 647,007, 647,008, 647,009, 668,315, capable of being affected by electrical waves or oscillations of high frequency."

Below is shown diagrammatically the Marconi patent applied for in 1896, and reissued as No. 11,913, shown at the left, and the Marconi patent in suit, shown at the right.

The transmitter of the patent in suit consists of an association of two circuits—a closed circuit, G, d, e, and an open radiating or antenna circuit, f, A, d¹, E. Of this association, the specifications (lines 33 to 36, page 2) say:

"Alternating currents of high frequency pass through the primary of the transformer (c) and induce similar oscillations in the secondary."

. And page 2, lines 12 to 20:

"My experiments have demonstrated that the best results are obtained at the transmitting station when I use a persistent oscillator—an electrical circuit of such a character that, if electromotive force is suddenly applied to it and the current then cut off, electrical oscillations are set up in the circuit which persist or are maintained for a long time—in the primary circuit."

The primary circuit, therefore, is a persistent oscillating circuit.

The characteristics of the radiating circuit are expressed (page 2, lines 20–24) as:

"A good radiator—i. e., an electrical circuit, which very quickly imparts the energy of electrical oscillations to the surrounding ether in the form of waves—in the secondary circuit."

The inductive linking of these circuits is spoken of (page 1, lines 56–62):

"The system also requires as essential elements thereof, the inclusion in the lines (at both stations) from the aerial conductor to the earth of variable inductances, and the use at both stations of means for varying or adjusting the inductance of the two circuits at each station to accord with each other."

An essential element of each of the circuits is variable means of adjustment, which is indicated in the radiating circuit, by coil 1, and in the closed or persistent oscillating circuit, G, d, e, the object being to adjust the circuits to be in accord with each other. Specification, lines 62–63, page 1:

"By this arrangement of apparatus I am able to secure a perfect 'tuning' of the apparatus at a transmitting station."

The definite purpose of the inventor with relation to adjustment of these circuits is more clearly set out at lines 118–129, page 2, in which he says:

"The capacity and self-induction of the four circuits, i. e., the primary and secondary circuits at the transmitting station, and the primary and secondary circuits at any one of the receiving stations, in a communicating system, are each and all to be so independently adjusted as to make the product of the self-induction multiplied by the capacity the same in each case, or multiples of each other—that is to say, the electrical time periods of the four circuits are to be the same or octavos of each other."

Page 3, lines 5 to 17:

"If the time periods of the circuits of the transmitting station are varied until they are in resonance with those of one of the receiving stations, *that one alone* of all the receiving stations will respond, provided that the distance between the transmitting and receiving stations is not too small."

"The adjustment of the self-induction and capacity of any or all of the four circuits can be made in any convenient manner and employing various arrangements of apparatus, those shown and described herein being preferred."

It is also said, page 1, lines 56 to 66:

"The system also requires as *essential* elements thereof, the inclusion in the lines (at both stations) from the aerial conductor to the earth, of variable inductances, *and the use at both stations of means for varying or adjusting the inductance of the two circuits at each station to accord with each other.* By this arrangement of apparatus, I am able to secure a perfect 'tuning' of the apparatus at a transmitting station, and at one or more of a number of receiving stations."

The source of power is connected with the primary circuit, which contains a condenser and the two circuits associated inductively, and the oscillations created in the primary circuit transferred to the antenna circuit.

The specifications further say:

"In operation the signal key *b* is pressed, and this closes the primary of the induction coil. Current then rushes through the transformer circuit, and the condenser *e* is charged, and subsequently discharges through this spark gap. If the capacity, the inductance, and the resistance of the circuit are of suitable values, the discharge is oscillatory, with the result that alternating currents of high frequency pass through the primary of the transformer and induce similar oscillations in the secondary, these oscillations being rapidly radiated in the form of electric waves by the elevated conductor."

The 1896 patent provides a transmitting station, comprising an elevated capacity, *f*, connected by means of the antenna, *A*, and spark gap, *G*, and thence to earth, and a source of energy, battery *a*, telegraph key, *b*, and an induction coil, *c*. When the circuit of the chart in yellow is closed by pressing down the key *b*, the current will flow from battery *a*, through the circuit, and the primary induction coil is energized, and that energizes the secondary of the induction coil, *c*, and the current is thereupon imparted to the spark gap, *G*, and when the resistance of the spark gap has been overcome, it breaks down, and the surgings across the spark gap produce oscillations in the antenna, *A*. The receiver has an aerial or antenna, *A*, connected to capacity, *f*, at the top, and earth, *E*, at the bottom. In the antenna circuit is a detector, *T*, connected to a local battery circuit, $c^1$, *r*, *b*, and $c^2$, and $t^1$, so that, when the energy is radiated from the transmitting antenna and impinged upon the receiving antenna, the detector, *T*, is operated, and in turn operates the telephone, which is indicated by *R*. The spark gap and the detector are in the transmitting and receiving circuits, respectively. The energy from the transmitting antenna is all radiated in two or three oscillations, being one big oscillation followed by two or three small ones. The antenna is a good radiator, and therefore not a persistent oscillator. The receiving antenna is a good absorber.

In the patent No. 763,772, in suit, Marconi removed the spark gap from the antenna circuit and put it in another circuit, *G, e, d* (red), in which circuit he put a condenser, so as to form a closed circuit. This closed circuit does not radiate energy, and is known as a persistent oscillating circuit. Marconi says:

"The approximately closed circuit of the primary being a good conserver, and the open circuit of the secondary being a good radiator of wave energy"

—and the purpose of the primary circuit being to slowly furnish the stored energy to replace that radiated through the antenna circuit, to

do so, the circuits must be in harmony with each other—tuned together.

To efficiently utilize the energy in the closed or primary circuit, it is necessary to associate it with the radiating circuit through a transformer or other means, and bring them into harmony or tune, and when they are in tune the energy is transferred from the primary to the antenna circuit, and radiated.

"Similarly two circuits of the receiver are linked through a transformer, so that electrical oscillations in the open or absorbing primary build up similar oscillations in the closed or conserving secondary, until the coherer breaks down," and "finally the four circuits must be tuned together." Marconi Wireless Telegraph Co. v. National Electric Signal Co. (D. C.) 213 Fed. 815.

In the first Marconi patent, it is said:

"According to this invention, I transmit through the air, earth or water, by means of oscillations of high frequency. * * * "

And again:

"When transmitting signals through the earth, I connect one end of the oscillation producer and one end of the circuit closer to earth and the other ends to plates, preferably electrically tuned with each other. in the air and insulated through earth."

In his Nobel prize lecture Marconi says:

"A very small amount was used, the high tension current being produced by an ordinary Rhumkorf coil. The main feature of my system consisted of elevated capacity areas or antenna attached to one pole of the high frequency oscillators or receivers, the other pole of which was earthed. * * * Many technical writers have stated that the elevated capacity at the top of the vertical wire is unnecessary. * * * The necessity or the utility of the earth connection has sometimes been questioned, but in my opinion no practical system of wireless telegraphy exists where the instruments are not connected to earth. * * * Physicists seemed to consider for a long time that wireless telegraphy was solely dependent upon the effect of free Hertzian radiation through space, and it was years before the probable effect of the conductivity of the earth between the stations was satisfactorily considered or disclosed."

Again he says:

"A remarkable fact, not generally known, in regard to transmitters, is that none of the arrangements employing condensers exceed in efficiency the plain elevated aerial or vertical wire discharging through earth through a spark gap as used in my first experiments," and "by means of the sharp gaps in compressed air, and the addition of induction coils placed between the aerial and the earth, the system can be made to radiate through pure and slightly damp waves, eminently suited for sharp tuning."

Many statements are made, confirming the conducting functions of the earth. Professor Pupin, replying to Marconi's New York address, said:

"The first time wireless telegraphy of the present day was produced was when Mr. Marconi, in 1895, connected his sending wire to the ground and his receiving wire to the ground and let the spark go. That was the first wireless wave of to-day, and it was not a Hertzian wave, and has nothing to do with it. If we are to call it a wave, let us call it a Marconi wave."

He further stated:

"You have seen that Mr. Marconi uses condensers and spark gaps and interrupted currents. * * * I do not believe in condensers and spark gaps —if I can get a real alternator, give me a high-power alternator that will give 40,000 vibrations per second. * * * I would not express that opinion so. boldly, perhaps, if I were not backed up by Mr. Marconi. * * * That is what Mr. Marconi wants; and he will have it if I can help him. With 100 kilowatts at 25,000 cycles, we should be able to telegraph to Australia. Distance means nothing. Hitch your wagon to the earth, and shake it hard enough, and there is no reason why you should not shake a message to Australia."

In the New York Electrical Society address, Marconi said:

"The arcs consisting of the condenser circuit and the elevated aerial or radiating circuit are more or less closely connected to each other by adjusting the inductance in the elevated conductor, and by the employment of the right value of capacity or inductance required in the condenser circuit, the two arcs were brought in electrical resonance, a condition which I first pointed out as being essential in order to obtain sufficient radiation and good tuning. * * * These two circuits are tuned so as to have approximately the same natural period of electrical oscillations. * * * It is well known that when using ordinary spark discharge in the primary circuit, unless weak coupling is employed, the oscillations set up in one circuit create oscillations of two frequencies in both circuits. This has the disadvantage that the radiated energy becomes divided between two waves of different length, and if the receiver is tuned to only one of these wave lengths, it will utilize or absorb only part of the energy reaching the receiver—the energy of the other wave being lost. * * * As it would have been too expensive to use vertical wires of very great height, the only alternative was to increase their size or capacity. * * * "

Tesla, in his book, page 213, with relation to resonance, says:

"To produce the best results, it is, of course, necessary to adjust carefully the capacity of the jars, the arc between the knobs and the length of the wires. My experience is that calculation of the length of the wires leads, in such case, to no result whatever. The experimenter will do best to make the wires at the start very long, and then adjust by cutting off first long pieces, and smaller ones as he approaches the right length."

The principle of resonance was old in the art, but apparatus by which to accomplish it was in the experimental stage. Resonant tuning implies accumulative action or building up by successive increments or pulses or waves from one circuit into another. "Resonant" is defined by the Standard Dictionary, 1895 Edition:

"Resonance, n. 1. The quality of being resonant; the act of resounding.

"2. Physics. (1) A *prolongation* or *re-enforcement* of sound by means of sympathetic vibration or the capability of producing such a *continued* sound. (2) By extension, the *increase* of vibration of any kind, as in electricity, by an intermittent force of the *same period.*

"The principle of resonance depends on the fact that to increase any movement of the nature of a vibration or oscillation, the force applied must act intermittently in the same period, as when a child moves a heavy swing by pushing always at the moment when the push has the greatest effect. The impulses are thus added together. An object capable of vibrating can always be set in motion in this manner by a neighboring object whose vibrations are in the same period, as when a note played on a musical instrument causes the same note on a neighboring stringed instrument to sound. The sounding-board of a) piano, guitar, or the like, is capable of responding to vibrations of many periods, and hence re-enforces all tones equally; the air in a flue organpipe on the other hand, can respond to one note only, and hence selects that one from the fluttering noise produced by the air at the lip. In electric-

ity the principle is valuable in detecting and investigating electromagnetic waves."

Judge Veeder said in Marconi Wireless Tel. Co. v. Nat'l Electric Signal Co., supra:

"Resonance is an increase or amplification of the periodic motion by an intermittent force of the same frequency. A certain or natural period of vibration is characteristic of all bodies which, when displaced by the application of external force, tend, by virtue of their elasticity, to return and to execute free vibrations until, by virtue of their exertion, they gradually come to rest. Sonorous bodies, such as strings under tension, and confined portions of the air, as in the organ pipe, are further illustrations suggested by the term. Just as very feeble impulses applied to a pendulum at rest, at intervals *exactly* corresponding to its natural period of vibration, will cause almost any desired amplitude of swing, so bodies capable of executing vibrations by use of their own resiliency, may be put into strong vibration by a *series of impulses* in tune with their own natural period. Thus impulses from a tuning fork will cause another tuning fork of the same pitch to hum a note in unison. Resonance effects may likewise be observed in the flow of electricity in a circuit. A circuit possessing inductance and capacity has a certain time period of vibration. * * * Such a circuit is said to have a definite wave length. A circuit possessing capacity and inductance tends to oscillate electrically at its own frequency. It becomes the seat of the *induced* oscillatory current when subjected to the influence of electric waves of that frequency, each wave giving a slight impulse to the oscillations already excited, with the result that the induced electromotive force will be amplified in intensity, just as the swing of a pendulum is increased by the application of properly tuned though feeble touches. However, not only must the impulses, of whatever kind, be rightly timed, *but it is essential* to the utilization of resonance that there should be a long series of such impulses of approximately equal strength or amplitude. Having regard to ether waves, *such a train can only result where the oscillations from which they proceed occur in the circuit which gives out its energy slowly, for the amplitude of the waves depends upon the energy expended.*"

To reconcile persistency of oscillations and amplitude of vibration in the radiator was a real accomplishment. Induction coils, generators, primary circuits, spark gaps, condensers, inductors, and the various elements that make up radio-telegraphic circuits are means of getting into the antenna, oscillations both of the persistent nature and at the same time of great strength or amplitude. Marconi associated a circuit, an oscillator, which, left to itself, threw off its energy rapidly, and the oscillations in which would be rapidly damped, with another circuit, which was a good conserver of energy, and, instead of giving off the energy rapidly in one big wave, withheld it, and gave it off slowly, and fed it gradually into the antenna as it was radiated out into space, which he called the "reservoir circuit." He desired to associate with his aerial a reservoir circuit as a conserver of energy, so that the antenna would have a persistent train of oscillations. The characteristics of the patent in suit are two circuits, the oscillator or antenna, which is a good radiator, associated with a circuit which is supplied with energy by a source of power, and which is so proportioned as to be a conserver of energy or a reservoir, or a persistent oscillator. Lodge's idea was to throw the energy into the antenna just as quickly as possible, so as to leave the antenna free to vibrate without interference of other circuits.

The Marconi receiver in issue has two circuits of like characteristics, the antenna, being a good absorber, associated with the closed circuit,

which is a good accumulator, this latter circuit to be so proportioned as to be a good accumulator as distinguished from a good absorber, and the energy being transferred by resonance from the primary to the secondary in each case, so as to build up gradually and maintain oscillations, each of the four circuits to be adjusted or tuned to the same time period by adjustable means in each circuit, enabling independent varying of its time period for change of wave length.

Judge Veeder, in Marconi Wireless Telegraph Co. v. National Electric Signal Co., supra, said:

"The essential features of this apparatus and its departure from previous methods of operation are apparent. In his first patent Marconi had disclosed a method and apparatus for the effective transmission of wave energy through the ether of space, and for its utilization in communication of intelligible signals. But in this early apparatus the energy was quickly radiated, and as quickly absorbed. By reason of this characteristic, his radiator could not create, nor could his receiver store up, the effect of a sustained train of waves necessary for the utilization of the principle of resonance. It was an effective apparatus for distress calls and purposes of that kind, but there was necessarily interference between messages. Moreover, the electric energy that he could get into his transmitter was necessarily limited. The energy supply had to be adapted to the elevated conductor. The capacity of a vertical wire is not great, and the extent to which it may be increased by lengthening the wire or adding capacity areas is obviously limited. Lodge came forward with a new idea. Although he recognized the impossibility of having a circuit which should be at once a good radiator or absorber and a persistent oscillator, he proposed a compromise. He increased the persistence of vibration of his radiating circuit at the expense of its radiating qualities, and increased the accumulative power of his receiving circuit at the expense of its absorbing qualities. Effecting this compromise by means of the introduction of an inductance coil in an open circuit, he obtained a train of waves of approximately equal amplitude, and thus rendered effective syntony possible. But the syntony thus obtained was utilized for selectivity alone. It was attained at the expense of the radiating and absorbing qualities of the circuit; and Lodge still supposed that for distant signaling the single pulse or whip crack was best.

"Marconi's improvement, in his second patent, upon his own prior apparatus, and his solution of the difficulty involved in Lodge's compromise, consists in the substitution for a single circuit in both transmitter and receiver of a pair of circuits, one of which is so constructed as to radiate or absorb readily, and the other to oscillate persistently and be a good conserver of energy. By using two linked circuits in his transmitter, in which the circuit of the primary contains a condenser of any desired capacity, with the usual provision for its discharge through spark gap, and in the circuit of the secondary, the vertical wire, any required energy may be imparted to the radiator, since the closed circuit of the primary is a good conserver or reservoir of energy for the radiating open circuit of the secondary. This arrangement would be futile, however, without means whereby the stored energy of the reservoir circuit could be transmitted to the elevated conductor at the rate at which that conductor could effectively radiate it. The mode of getting the energy from the reservoir circuit into the radiating circuit, in like measure as it is radiated, is the tuning of the persistently oscillating circuit to the radiating circuit."

Judge Parker, in Re British Radio T. & T. Co., Ltd., which case is cited by plaintiff, in passing upon the English patent, in which the expression "persistent oscillator" is neither used nor defined in the specifications, says:

"As I interpret the patent, the essential features of the invention thereby disclosed are as follows: In order to get over a well-known difficulty in applying the principle of resonance as between transmitter and receiver in a

system of wireless telegraphy, a difficulty involved in the impossibility of a single circuit being at once a good radiator or absorber and a persistent oscillator, the inventor proposes to substitute for a single circuit in both transmitter and receiver, a pair of circuits, one of which is so constructed as to radiate or absorb readily, and the other of which is so constructed as to oscillate persistently and be a good conserver of energy. The two circuits of the transmitter are tuned together, and linked by means of a transformer in such a way that electrical oscillations in the closed and persistently oscillating circuit build up, and, inasmuch as the primary can act as a reservoir of energy for the secondary, maintain similar oscillations in the open and readily vibrating secondary. Similarly, the two circuits of the receiver, tuned to the same time period as the circuits of the transmitter, are linked through a transformer in such a way that electrical oscillations in the readily absorbing primary build up similar oscillations in a closed and conserving secondary, until such oscillations have strength to break down the coherer. * * * Take two circuits, and let one do one of the things and the other do the other. The electrical engineer, reading the specification, would thus be led, not only to expect a long train of ether waves created through the medium of an open radiating circuit by persistent oscillations occurring in a closed conserving circuit, but an actual increase in the total available energy of the radiating circuit, this increase depending on the conserving qualities of the closed circuit. In other words, the latter would be a reservoir of energy for the former."

Claim 3 of Tesla, No. 649,621, filed May, 1900, provides:

"3. The combination with a transmitting instrument comprising a transformer having its secondary connected to ground and to an elevated terminal, respectively, the means for impressing in electrical operations upon its primary, of a receiving instrument, comprising a condenser having its primary similarly connected to ground and to an elevated terminal and a translating device connected with its secondary. *The capacity and inductance of the two transformers have such values as to secure synchronization with the impressed oscillations.*"

And claim 10 of the Marconi patent in suit:

"10. A system of wireless telegraphy in which the transmitting station and the receiving station each contains an oscillation transformer, one circuit of which is an *open circuit*, and the other a *closed* circuit, *the two circuits at each station being in electrical resonance with each other, and in electrical resonance with the circuits at the other station,* substantially as described."

Braun patent, No. 697,544, filed February 6, 1899, has this recital (page 1):

"This divisional application relates to apparatus in which the transmitting wire is inductively associated with the oscillation circuit; an oscillating circuit, comprising a Leyden jar or inductance coil, is, and for a long time has been, well known to be a persistently oscillating circuit, or a circuit in which, its electrical equilibrium having once been disturbed by vibrations or oscillations, continue for a considerable length of time. In other words, this circuit is a source of maintained or sustained electrical oscillations. This circuit I have likened to a 'reservoir of energy,' a portion of which is radiated from the transmitting wire, *for every oscillation until there is no more energy left,* and the circuit ceases to vibrate."

While this patent was not issued until 1905, the knowledge disclosed in the application is in advance of the Marconi application; and this is also true of the other contemporaneous applications.

Pupin, in the discussion in New York, at the one hundred thirty-seventh meeting of the American Institute of Electrical Engineers, November 22, 1899, on the possibilities of wireless telegraphy, at page

624 of the published report of the proceedings, among other things, said:

"The forced oscillations of the string are not rapidly decaying, because the body vibrating it—the tuning fork—is a sonorous body. The condenser, *a, c* (Fig. 6), with a shunt, is an electrical oscillator, an electrical tuning fork. * * * You start oscillations in this circuit just as you start the vibrations of the tuning fork by a stroke. These oscillations then keep up the oscillations in the vertical wire. * * *"

Mr. Pickard has diagrammatically represented the suggestion, as follows:

### PUPIN 1899 FOUR CIRCUIT SYSTEM
TRANSMITTER PRIMARY A PERSISTENT OSCILLATOR RESERVOIR. LIKE THAT OF MARCONI PATENT IN SUIT.

— FIG. 6 —

"By varying the dimensions of the shunt, *m, n, o,* or capacity of condenser *e*, we can tune this circuit."

Judge Veeder, in referring to the Marconi patent in suit, in Marconi Wireless Telegraph Co. v. National Electric Co., supra, said:

"By using two-linked circuits in his transmitter, in which the circuit of the primary contains a condenser of any desired capacity, with the usual provision for its discharge through the spark gap, and in the circuit of the secondary, the vertical wire, any desired energy may be imparted to the radiator, since the closed circuit of the primary is a good *conserver* or *reservoir* of energy for the radiating open circuit of the secondary."

The principle of resonance in telegraphic art may be further shown by patents No. 640,516, issued January 2, 1900, to Pupin, for "electrical transmission by resonance circuits," and Pupin patent No. 519,347, issued in 1894.

Stone, in his patent No. 577,214, issued February 16, 1897, being "improvements in resonant electrical circuits," assigned to the American Bell Telephone Company, after the circuit is described, says:

"Such a circuit is an ideal resonant circuit, and will be highly selective if the coil be of low resistance and great inductance, while the condenser is of small capacity. By the term 'selective' is meant that property which resonant circuits exhibit of responding more strongly to the currents of one particular frequency than to those of any other frequency, and by 'selectivity' reference is made to the degree to which they exhibit this selective property."

And in Stone patent, assigned to the same company, No. 638,152, issued November 28, 1899, for "new and useful improvement in telephony," it is said:

"In the present invention the high frequency current is developed by the disruptive discharge of the condenser in the sonorous circuit, * * * an arrangement of circuits by means of which the invention may be applied to selective and multiple telephony. For this purpose the sonorous resonating circuit * * * and the resonator circuit * * * are attuned to the same frequency, while those at * * * and * * * are attuned to some other frequency. * * * The frequency of this oscillatory current is determined by the electromagnetic, electrostatic, and dissipative resistance of the primary circuit. * * * The frequency of the current developed by the transmitting sonorous circuits is determined by the self-inductance and capacity of the circuit, including the primary of the induction coil, the inductance coil, the condenser, and the spark gap, and by *properly proportioning* this self-inductance and capacity, any desired frequency between very wide limits may be obtained. The attuning of the receiving circuits is likewise accomplished by proportioning the inductance of the secondary circuit to the capacity of the condenser located in the secondary circuit."

### STONE 1899 FOUR TUNED CIRCUIT SYSTEM

February 28, 1900, Stone disclosed to Mr. Pickard a four-tuned circuit system, which Mr. Pickard has diagrammatically represented as above. June 30, 1899, prior to conversation with Mr. Pickard, Stone wrote to Mr. Baker, in which, inter alia, he said:

"Instead of utilizing the vertical wire itself at the transmitting station as an oscillator, I propose to impress upon this vertical wire, oscillations from an oscillator, which oscillations shall be of a frequency corresponding to the fundamental of the wire. * * * Similarly, at the receiving station, I shall draw from the vertical wire only that compound of a complex wave, which is of lowest frequency. If, now, the fundamental of the wire at the receiving station be the same as that of the wire at the transmitting station, then the receiving station may receive signals from the transmitting station, but if it be different from that of the transmitting station, it may not receive those signals."

In a letter of July 18, 1899, from Stone to Baker, he said:

"The tuning of these circuits one to another and all to the same frequency will probably be best accomplished empirically, although the best general proportions may be determined mathematically."

There is no controversy, I think, as to the authenticity of the letter of July 18th, and I am satisfied that the letter of June 30th was

written prior to July 18th, and there is no reason to doubt that it was written on June 30th, the date testified to by the witnesses who have knowledge, although I am satisfied that the date, June 30th, was written subsequent to the writing of the letter.

That resonant transfer of energy was long known to the art is further demonstrated by the fact that as early as May 9, 1894, Morris Hutin and Morris Le Blanc, in application for patent for "multiple telegraphy and telephony," used this language:

"It is clear that our electric resonators are circuits in which the real react-ance as distinguished from the apparent reactance for the given periodicity of alternating currents is made zero, so that the impedance of the circuit is equal to its ohmic resistance. For the purposes of our invention it is often necessary to connect a part of the electric resonators together so as to form a group. * * * Supposing, now, that the line, either grounded at each end, as shown, or having a common return wire, is charged simultaneously with three sets of alternating currents having frequencies 1,000, 2,000, 3,000, respectively, it will be clear that the resonator-circuit $3'$, $4'$, and $5'$, will permit only the circuit having the frequency of, say 1,000, to pass through, and that the other resonators will only permit the currents having frequencies of 2,000 and 3,000, respectively, to pass through. If either of these currents is varied in intensity by any suitable device, at any point on the line, these variations will be felt by the transmitting device in the resonator circuit only which is adjusted to the frequency of the varied currents. * * * This analogy between * * * electrical resonance, we have fully set forth and explained in our articles in Lalumiere Electrique."

The prior art publications admitted in evidence present a wealth of information upon the prior art with relation to electrical resonance and tuning, and with the other evidence in the case, remove from my mind any doubt as to these principles with relation to the prior art long before the application for the patent in suit.

The essential necessity of plaintiff's Marconi patent is means to transmit the stored energy of the reservoir circuit to the antenna circuit, at the rate at which it can be effectively radiated, and the method by which this energy may be transferred into the radiating circuit, in the same quantity and as it is radiated, is by tuning the primary or persistently oscillating circuit to the antenna or radiating circuit, and thereby getting full value, utilizing between the two circuits the principle of resonance. The reservoir circuit is necessarily always a resonant—i. e., oscillating—circuit. The novel difference between the 1896 patent, expired, and the 1900 patent, as given by Marconi, is the removal of the spark gap from the "open transmitting circuit, and including it in the closed or nearly closed oscillating circuit, which closed oscillating circuit was inductively connected with the open antenna circuit." In the receiver circuit the detector is removed from the open antenna circuit with the same relation and upon the same principle.

That tuning is the essence of the Marconi patent in suit is further demonstrated by correspondence between Marconi and the examiner, upon the rejection of the claims by the examiner, in which he stated, December 24, 1900, inter alia:

"It is required that further and clearer description be inserted in the speci-fication as to what is meant by 'persistent oscillator' and 'good radiator'"

—and the further understanding of the examiner from correspondence is shown from the following extract from his letter of February 11, 1902:

"Applicant's argument has been carefully considered, and though difficult of interpretation by reason of grammatical defects, and also because of what seems to be discontinuity of idea, it is correctly or otherwise interpreted by the examiner to mean that the fundamental of the aerial conductor is a harmonic of the local primary, or vice versa, and that such a relation necessarily requires that the vibrating body of fundamental periodicity *have constants such as cause it to be a persistent oscillator and the aerial conductor electrical constants which make it necessarily a good radiator.*"

And counsel for Marconi, in a letter of April 8, 1902, say:

"It is very plain that the necessity or desirability of tuning the two circuits of the primary to each other, or making them accord to each other in their natural period of oscillation, is not an obvious suggestion from prior descriptions of desirability of tuning a primary to the receiver, as is seen from the fact, although the English patent of Thompson, No. 22,020, of 1899, describes a two-circuit primary, yet the inventor makes not the faintest suggestion of the desirability of having the periods of oscillation accord with each other, and although Mr. Marconi himself, in his patent No. 627,650, describes a two-circuit receiving instrument, yet he did not make any suggestion that it would be of advantage to make the periods of oscillation of the two circuits accord."

In determining the construction to be placed upon public documents, consideration is given to departmental interpretation.

June 13, 1903, in Re Braun, Application Serial No. 704,505, appears a statement by the Patent Office prior to the issuance of the plaintiff Marconi patent in suit, and while the application was under consideration, of the meaning of the term "persistent oscillator," in which it is said:

"Only a definite limited amount of energy can be stored up in any capacity apparatus, and in the case of a given oscillator for wireless telegraphy it is evident that there is always a fixed maximum charge that cannot be exceeded. If, therefore, an oscillator of given capacity is so constructed as to radiate substantially all of its energy in one or two waves, the one or two waves so radiated will be of the maximum energy possible with such a system, *whereas if the oscillator is so devised as to be a persistent oscillator, it will send out a very much greater number of waves at each discharge, but each wave will have only a fractional amount of the energy that could have been radiated in a single wave.* For instance, in the one case the given capacity being charged with a given amount of energy, $x$, the energy of the one or two waves in the one case will be substantially equal to $x$, or to $x^2$, as the case may be, *whereas, in case the radiator is arranged to be a persistent* oscillator so as to give a *long train of waves, as for instance 100,* then the energy, $x$, being split up among 100 waves of a train, the energy of each one of those waves will be represented by the value $x/100$. For use with a coherer, which, from its nature, operates only in response to the maximum potential impressed at any one instant, the first arrangement would be 100 times more efficient than the latter. It is obvious that if the coherer is so far distant that it will only respond effectively to a wave having the energy, $x$, at the transmitter, it will not respond to 100 or 1,000 or an infinite number of waves having only the energy $x/100$."

And Marconi, in his affidavit, when referring to the Braun circuit transmitting apparatus, says:

"Much less had he [Braun] understood that there was or could be any advantage in making the two circuits of such inductance and capacity as to have a natural period of oscillation in accord with each other."

And, referring to the Braun patent, in his deposition, he says:

"Hence the Braun patent illustrates merely the introduction of the transformer without any disclosure of the principles of my patent, namely, the

proportioning of the circuits to act as reservoir and radiator respectively, while efficiently transferring the energy by tuning these circuits to one another. My patent No. 627,650 differs essentially in principle from my patent No. 763,772, in that in the former I did not describe or disclose the fact that the closed oscillating receiving circuit was to be *tuned to the open* antenna receiving circuit, while in my patent No. 763,772, *I disclose and describe means for attaining* this useful object."

And on page 28 of his deposition he says:

"Furthermore this [Fessenden] patent shows no means whereby the tuning could be effected, there being no variable elements shown in either of the circuits."

And on page 31:

"The difficulties to be overcome in order to transmit an intelligible message to a great distance prior to the utilization of the invention of my patent No. 763,772 were *manifold.* They were also the result of interlinked and obscure causes, and hence one of the greatest difficulties must be overcome to attain success. In the evolution of the apparatus of my patent No. 763,772, I found that I could attain the long distances desired by *separating the functions performed in the original* single wireless transmitting circuit of my patent No. 586,193 and reissue No. 11,913, and assigning them to associated unlike circuits, one of which was a *closed circuit,* and hence not capable of radiating energy, and the other an *open* circuit which was capable of radiating energy, I found that by doing this I could so construct the closed or nonradiating circuit as to make it serve as a *reservoir* and so perform the function of receiving a relatively large initial charge, and that by *properly associating* the circuits and *tuning* them to have the same period, *transfer* this stored energy to the open or radiating circuit and obtain an efficient radiation of a larger quantity of energy with very much less decay of the waves. The transmitting difficulties thus overcome were the *inability to efficiently store* a quantity of energy and the inability to radiate it without undue losses and high damping."

It would therefore appear that the definitions given in the specifications and claims to meet the reference made by the Patent Office preclude any other conclusion than that tuning was the purpose sought. Sargent v. Hall Safe & Lock Co., 114 U. S. 86, 5 Sup. Ct. 1021, 29 L. Ed. 67; American Stove Co. v. Cleveland Foundry Co., 158 Fed. 983, 86 C. C. A. 182.

The application not being for the principle of resonance or tuning, or such foundation as a scientific fact, reference to specification may be made for interpretation of claims made. Tilghman v. Proctor, 102 U. S. 707, 26 L. Ed. 279.

Marconi is not a pioneer in the art of resonance in his invention, in the sense that he discovered the principles of resonance or the art of tuning two circuits to the same frequency. His accomplishment must rest upon the utilization of known principles which he co-ordinated with ideas of his own invention, which are involved in the patent in issue, and have proven of great value to the world. His patent is not for tuning in general, but for particular, variable, selective apparatus, which the defendant does not use.

"By way of specific and detailed information as to how the capacity and self-induction of these circuits may be independently adjusted, so as to make the product of the self-induction multiplied by the capacity the same in each case, and thus obtain four circuit tuning, a table of tunes is given. The broad claim of invention resides, therefore, in the independent adjustment of the capacity and self-induction of the four circuits, two at the transmitting sta-

tion and two at the receiving station, so that the product of these elements in each of the two circuits shall be the same, in order that the circuits may be in electrical resonance with one another. This broad invention is covered by claims 10 and 20 in issue." Marconi Wireless Telegraph Co. v. National Electric Signal Co., supra.

The Simpson mercury valve transmitter is diagrammatically represented as follows:

### DEFENDANT'S "SIMPSON" MERCURY VALVE TRANSMITTER

SIMPSON DRAWING

$D$ represents an alternating current dynamo, and $T$ a power transformer, $V$ a mercury vapor rectifying valve, having terminals, $A$, $A^1$, and $N$. $A$ and $A^1$ are anodes, the positive terminals of the valve. $N$ is called a cathode, the negative terminal. $R$ is resistance; $C$, variable condenser. $2$ represents the horizontal structure of the overhead portion of the antenna. $3$ is a vertical wire connecting the overhead portion of $2$ by variable connection $5$, with the inductance coil $L$, this being a helical coil. $W$ is a flat spiral inductance coil, connected to the inner terminal of the inductance coil $L$ at the terminus of its center convolu-

tion. The extremity of its outer convolution is connected to one terminus of the variable condenser, $C$, and the other terminus of the variable condenser, $C$, connected to the earth by conductor, 4. $S$ is a spark gap of special form and is connected to the ground through the conductor 7 and the ground connection wire 4. The alternating current dynamo is connected through its brushes each to the respective terminus of the primary coil $P$ $c$, of the power transformer $T$. $K$ is the operator's key. The secondary coil of the power transformer $T$ is designated as $S$ $c$. Each outer extremity of this coil is connected to the respective anode of the mercury valve $V$. From the center of the coil is taken a conductor, 6, which is connected to the variable condenser, $C$, at the point where it is joined to the extremity of the outer convolution of the spiral $W$. The cathode end of the mercury valve $V$ is connected to one extremity of the resistance $R$. The other extremity of the resistance $R$ is connected to the variable condenser $C$ at its terminal opposite to that connected to the center point of the secondary coil $S$ $c$; the same extremity of the resistance $R$ is also connected to the ground through the common ground conductor, 4. The transmitter functions, as stated by Mr. Simpson and other witnesses, by having dynamo $D$ generate an alternating potential current between its brushes, one brush being upon each of the collector rings, of 110 volts and sometimes 220, depending upon the type or kind of machine, the pressure or potential, of 110, or sometimes 220, is stepped up in the power transformer $T$ to a pressure normally 4,400 volts between the outer terminals of the secondary coil $S$ $c$, sometimes dropping to 4,000 volts. The pressure from the outer terminal to the middle conductor, 6, is just one-half, or 2,200 volts, when it is 4,400 volts between the outer extremities of coil $S$ $c$. The mercury valve, $V$, will conduct current under normal conditions from the anodes, $A$, $A$ [1], to the cathode $N$. The current will not flow from the cathode $N$ to either anode $A$ or $A$ [1], unless a relatively high pressure is placed upon the valve. A pressure impressed upon the valve, in the machine in evidence, would be something like 20,000 volts to reverse the current. The direction of the flow of current from the secondary coil $S$ $c$, and the power transformer $T$ to the radiating system is always the same. It is a unidirectional current, that cannot reverse its direction of flow, because the valve acts as a check valve in the charging system, and permits the current to flow from its source, the secondary coil $S$ $c$, to the point where it is needed. It does not permit the current to be returned from any such point to its source. The valve $V$ has resistance which varies inversely with the current flowing through it. As the current becomes greater in quantity, the resistance becomes less. If the potential between each extreme terminal of the secondary coil $S$ $c$, of the power transformer $T$, were in such a direction that if a current were permitted to flow through that coil, from the bottom of the coil, as shown on the chart, to the top of the coil, the valve $V$ would only permit such current to flow from the upper terminal of the secondary coil $S$ $c$, to the anode $A$, thence within the valve to the cathode $N$, thence through the resistance $R$ to the variable condenser $C$, charging the variable condenser $C$, through the conductor 6, back to the center of the secondary coil $S$ $c$.

"If we imagine in the next instant of time that the alternating potential had reversed its direction, so that the direction of the alternating potential was such that it would produce a current normally flowing from the top of the secondary coil $S$ $c$, toward the bottom of that coil, then such a current, with the arrangement shown on the chart, would flow from the bottom of the secondary coil $S$ $c$, to the anode $A$ $1$ of the valve $V$; thence through the variable condenser $C$, and complete its circuit from the variable condenser $C$, through the conductor $6$, back to the center of the coil again, pulsations being sent in the charging circuit, through the valve $V$ into the condenser $C$. These pulsations are also unidirectional, the valve $V$ acting as a rectifier, rectifying the alternating current from the dynamo $D$, acting through the transformer $T$ and sending unidirectional or pulsating currents into the variable condenser $C$. Now there is also a comparatively small amount of charge taken by the condenser which is constituted by the ground * * * and the overhead portion of the antenna, marked $2'$ on the chart. That amount of energy is really exceedingly small as compared to the amount of energy placed in that portion of the antenna system, constituted by the variable condenser $C$. The spark gap $S$ is so adjusted as to break down, at some prearranged pressure or potential. That potential is usually a peak potential of the pulsations; that is, the highest potential the pulsation reaches. It may even be a little higher than that, due to the so-called inertia effect of the circuit, which would raise it a trifle. This spark gap $S$, having been adjusted to break down at such a potential, when a sufficient amount of charging current has flowed into the variable condenser $C$, to bring its potential up to the breakdown point of the spark gap $S$, a discharge takes place. This discharge is always, with the arrangement of circuits shown in the chart, * * * which * * * is identical with the arrangement of circuits in actual use, from the bottom of the condenser $C$, through the conductor $7$, thence through spark gap $S$, the conductor $8$, and such fraction of the outer convolution of the spiral coil $W$ as may be used, thence to the opposite terminal of the variable condenser $C$. That discharge is a unidirectional impulse, and, with a normal arrangement of circuits, i. e., the transmitter set up as it always is, for operation, is always a unidirectional impulse. The effect of it is this: Energy is placed within the antenna circuit, the antenna proper of this transmitter, directly from its source."

The antenna circuit is said to consist of the overhead conductor $2$, its vertical connections $3$, inductance coil, or some portion of inductance coil $L$, flat spiral inductance coil $W$, variable condenser $C$, earth connection $4$, and ground. The spark gap $S$, with its associated conductors forms a part of the antenna system. The energy, when communicated from its source into the antenna, is in the static, its potential form, but thereafter is converted from the static, its potential form, into the kinetic form, that is, into oscillations, within that portion of the antenna consisting of the overhead conductor $2$, conductor $3$, inductance coils $L$ and $W$, condenser $C$, earth connection $4$, and ground. Such conversion is known to the art as impulse excitation. Impulse excitation of oscillating currents is one in which the energy is set in motion within the oscillating, radiating circuit, by a single impulse, as distinguished from a transfer of energy by other means.

The quenched spark gap introduced into this country in 1908 by the Telefunken Company, of Germany, and now used upon all apparatus in suit, has added much to the efficiency of wireless apparatus. By it the character of the wave can be readily controlled, and the quality (sharpness and purity) of the wave can be brought into harmony with the result desired, and the high frequency generator impulse system will enable the operator to hitch "your [his] wagon to the earth and

shake it, \* \* \*" and send messages to distant parts of the world, as stated by Pupin, supra.

The action of the grounded antenna does not yet seem to be conclusively determined. Marconi's idea with relation to the grounded action changed from the time of the filing of the 1896 application, so that special emphasis to grounded influence was omitted from the 1900 application; but subsequent development confirmed his former belief, and Pupin's suggestion seems to receive emphasis in the high frequency generator impulse and "single chunk" conversion of energy apparatus of defendant.

The purpose of the Simpson mercury valve is to prevent an arc to form at the spark $S$, enabling that spark to rapidly regain its high resistance quality and open up in order that it may leave the antenna free to oscillate in its own natural way, and to rectify the alternating current into a "pulsating current."

The circuit comprised a part of the elements of the antenna system, condenser $C$, and a part of the spiral $W$, across which is placed the spark gap $S$, making a circuit composed of $S$, $W$, $C$, $7$, which has the characteristic of having a large ratio of capacity to inductance, and is not a persistently oscillating, generating circuit, but has a function of disturbing the equilibrium of forces which exist in the antenna system, in order that it may produce persistent oscillations of a single frequency in that antenna system. The effect of this circuit upon the radiating circuit, as stated by Dr. Kolster, "is such as to get the energy into that radiating circuit very quickly, and to thereafter allow it to oscillate freely in its own natural way." This circuit has enormous decrement, and is nonpersistent. It is not, as in the Marconi patent in suit, *primarily* a reservoir or persistent oscillator, and does not co-operate with the antenna on the principle of resonance.

The defendant, to demonstrate the fact of the "single chunk" conversion of antenna energy, introduced the result of experimentation conducted at the University of Washington with the Braun tube on the behavior of the Simpson Mercury Valve Transmitter. The photographic reproduction shows the type of photograph obtained by Dr. Kolster, by the use of the Braun tube. The method used was that of producing deflections of the spot of light across the fluorescent screen, and photographing that deflection of light. The deflection of the spot of light across the screen corresponds with the motions of the current, first in one direction and then in the other, and, if the disturbing circuit is not characteristically an oscillating circuit, by the use of the mercury valve, whose function is to rectify the alternating current supply, the spot of light would appear as in the photograph. If no mercury valve be used, an impulse would be obtained first to the left and then to the right, the time period being a function of the frequency of the generator in a 500 cycle generator supplying the condenser $C$, occurring at intervals of $1/1000$ of a second.

The contention of the plaintiff with relation to the Massachusetts test, in which it was shown that there were two and one-half oscillations in the antenna circuit, and that this must refute the contention of the defendants with relation to the Washington University photographic

test, may be answered by the suggestion that the Washington University result was obtained, the photograph speaks for itself, and defendant's witnesses to that extent are corroborated. The Massachusetts experiments show that there were many elements that entered into the experiments with relation to the appliances and the adjustment of the apparatus. Dr. Zennick's testimony, which does not seem to be denied, shows that photographs were only taken when the adjustments were such as to produce the desired result, and that the effort was for the purpose of obtaining evidence of oscillations in the trigger circuit, rather than to present to the court the result of all of the experiments that were made, together with the adjustments for each result—an impulse charging circuit such as defendant's requires a certain relative inductance and capacity and resistance to produce energy in substantially one oscillation, and the increase of inductance over capacity, and resistance beyond the proper ratio will change the characteristic of the impulse charging circuit—and the further fact that it is shown that, as stated by Dr. Zennick, "there was only one system, the dummy antenna, and only one kind of oscillations, the free oscillation of the antenna;" and it further appears that oscillatory circuits are not necessarily tuned circuits, and good tuning is not possible with $2\frac{1}{2}$ waves in the train. No facts shown indicate that the oscillations were the result of resonant transfer of energy. Dr. Zennick further stated:

"I have actually calculated the curves, according to the photographs $B1$ and $BM$, assuming the figures given by Dr. Chaffee, * * * and we have length of about 600 meters capacity $CL$, equal to .001 microfarads, and the resistance of about 6 ohms, meaning a decrement of about .06. The result is represented on the chart which I marked '$Z7$', assuming as a decrement the value, .04, which had been measured in the tests made at the Bureau of Standards, and which corresponds to the figures given in the report of the committee on standardization of the Institute of Radio Engineers, pages 22 and 23, No. 1011, for a standard antenna of 600 meters we have length * * * assuming these figures, the corresponding curve is represented on the chart, $Z8$. These curves show very clearly that after an extremely small percentage of the entire oscillation time we get the free oscillations of the antenna, if we compare these oscillations represented on charts $Z7$ and $Z8$ with the oscillations of the system oscillating from the beginning with its free oscillations, not only after $2\frac{1}{2}$ oscillations—I have represented these oscillations in figures which are marked '$Z9$', corresponding to a decrement of .06, and '$Z10$', corresponding to a decrement of .04—it may be that we would hardly become aware of the difference between these figures if our attention had not been called to it. I may add the following: The committee on standardization of the Institute of Radio Engineers, in its report for 1915, Defendant's Exhibit 61, page 14, has defined 'impulse excitation' as follows: 'A method of producing free alternating current in an excited circuit in which the duration of the exciting circuit is short compared with the duration of the excited current.' This definition has again been agreed upon in one of the last meetings. I fully agree with this definition, and think, therefore, that the oscillations represented in Figures $Z7$ and $Z8$ represent a very good example of impulse excitation. There is no question that the impulse excitation would be still purer if the free oscillations were already present after one-half oscillations. I have shown this case in Figure $Z11$ for the decrement of .06, but comparing this figure with the corresponding Figure $Z7$, for the same decrement, it seems to me that the difference between these two figures is extremely small. From the standpoint of a physicist, therefore, and considering the result, it seems to me very immaterial whether the free oscillations start after one-half an oscillation or after $2\frac{1}{2}$."

## DEFENDANT'S "IMPULSE" TRANSMITTER

### THOMPSON DRAWING

The defendant's Thompson impulse transmitter consists of a supply circuit, consisting of an alternating current generator and power condenser, $a$, connected with two resistances, $R$, $R$, which are connected to the opposite terminals of two condensers, $j$, $j$, connected in series with one another. Branching from this condenser $j$, $j$ to either side is a symmetrical circuit containing spark gaps $h^6$, $h^7$, and a single turn of wire marked "$h^2$," this branch circuit being marked "$1$." Inductively associated with the single wire, $h^2$, is an antenna circuit consisting of the antenna marked "$2$" and the tuning inductance marked "$h^4$," the connecting wire marked "$h$," the coil marked "$h^3$," and the connecting wire marked "$h^1$," which may go directly to earth, or which may go through a condenser $C$ to earth. The circuit containing the condensers $j$, $j$ and the spark gaps $h^6$, $h^7$, and the single turn of wire $h^2$ may be called a disturbing circuit, and consists of the two elements, capacity and inductance, both being fixed in value. The other elements are so chosen that the ratio of the capacity to the inductance is extremely large. In the antenna circuit which is inductively associated with the circuit No. $1$ of the chart $z^8$, the inductance coils $h^4$ and $h^3$ have means of varying their inductance by changing the number of turns on either one of the coils or both, in order that this antenna system may be tuned or adjusted to emit any wave length desired between 300 and 600 meters, and particularly two wave lengths 300 meters and 600 meters, which are the two wave lengths for use for commercial purposes.

There being no variable elements in circuit $1$, the only adjustments necessary are in the antenna circuit itself. The tests before the court demonstrated that no change in time period placed more than one wave in the antenna. In radiating a wave from the antenna of 600 or 300 meters, no variation is made in either the capacity or inductance of the charging circuit, the product of the inductance and capacity in circuit $1$ being the same in sending out a 300-meter wave as a 600-meter wave from the antenna. In the operation of this transmitter the only variation in the inductance in changing from 300 to 600 meters is the use of a fewer number of turns in the inductance, and would, in most cases, be made by opening the switch short-circuiting the condenser $C$. The only adjustments are of the antenna circuit for the variation of wave length. The difference in the operation of the de-

fendant's impulse transmitter and the plaintiff type of transmitter is in the fact that there is an entire absence of resonant tuning in the impulse transmitter, whereas in the tuned, coupled circuit transmitter, for any change in wave length there must be a change of tune of the two associated circuits, so as to keep them in resonance. The defendant's impulse transmitter is electrically the same as Lodge's and carries out his thought with relation to the transmission of energy.

It is conceded by the plaintiff that the defendant's Thompson transmitter is not an infringement of the plaintiff's patent when used at 300 meters, but that when used at 600 meters the circuits are in substantial resonance, and because of such fact is an infringement of plaintiff's patent. I do not believe that this contention is tenable. The Thompson transmitter operates at different wave lengths, as demonstrated before the court, without variation of the time period of the impulse charger, and not upon the principle of resonant transfer. The structure of such apparatus substantially differs from plaintiff's, and because its variation is not limited, and at some point it is in harmony with an apparatus with a fixed variation, would not show conflict or infringement, where resonant transfer is not shown. No appliance is placed upon the defendant's apparatus by which tuning to other than fixed frequency can be made by the operator; whereas the plaintiff's apparatus is constructed with variable tuning appliances by which the operator can fix the time period to any desired wave length. The fact that coils of different length may be constructed and placed upon the Thompson transmitter, as was demonstrated by plaintiff before the court, and the time period be thereby varied, cannot avail plaintiff, as such would not be the structure of defendant; nor can the plaintiff be permitted to enlarge the claims of the patent by "broad tuning," in view of the express language employed in the patent.

PICKARD CHART

LODGE PATENT IN SUIT (EXPIRED)

FIG. 4                    FIG. 13

In the Lodge patent in suit, expired, is a radiating system, including coils $h^4$, $h^4$, and conductors $h$, $h^1$, being the antenna and ground connection, respectively, as a radiating circuit connected by way of spark gaps $h^7$, $h^8$, and $h^6$, $h^8$, to the charging or supply circuit. This circuit

consists essentially of two condensers, Leyden jars, $J$, $J$. To this supply circuit is added the coil, $k$, $k$. The intention is apparent that the spark gaps $h^2$, $h^3$, should be gaps of low resistance, and that $J$, $J$, should have a high potential; that spark gap $h^{10}$, $h^{11}$, is called a "starting gap," and when the spark gap $h^{10}$, $h^{11}$, breaks down, the charging supply circuit, $J$, $K$, $J$, delivers its charge through the gap $h^8$, $h^6$, and $h^8$, $h^7$, to the radiating circuit. When the Rhumkorf coil, $a$, is energized, there is a charge of the condensers, $J$, $J$, until all of the energy which can be stored in these, as limited by the potential reaching above the spark gap $h^{10}$, $h^{11}$, breaks down, the energy stored in these condensers, $J$, $J$, is converted into a sudden or impulsive current rush, first through the circuit $J$, $K$, $J$, and then immediately into an impulsive rush or charge of current across the gaps $h^8$, $h^6$, $h^8$, $h^7$, into the conductors $h$ and $h^1$, and starts an electrical current through the gap $h^2$, $h^3$, very suddenly, and oscillations are set up in the entire antenna system and radiated. By this system it was not possible to obtain effective tuning or syntony. For effective tuning, resonant tuning, a relatively great number of impulses is required, that is, a drawn out train of waves. The coils $h^4$, $h^4$, are variable, so that, by changing their value, any desired frequency may be obtained and placed in electrical resonance with any receiving circuit.

Lodge does not use one circuit as a reservoir for the other, there being no resonant transfer of energy, the circuit in which the charge originates being entirely separated when the radiating circuit is charged.

"A receiver or resonator consists of a similar pair of capacity areas connected by a similarly shaped conductor or self-inductance coil, the whole constituting an absorber arranged so as to have precisely the same natural frequency of electrical vibration as the radiator in use at the corresponding remitting station, so that it can accumulate and receive impulses—that is to say, can act accumulatively—but it must not have a spark gap such as $h^2$ and $h^3$, or, if it have a spark gap, same must be carefully closed or shunted, or bridged across for a good short conductor. * * * Identically the same capacity areas and self-inductance coil can be used at will either as transmitter or as receiver * * * on condition that the 'discharge' spark gap $h^2$ $h^3$ of the radiator is perfectly closed whenever acting as receiver." (Lodge patent, page 3, second column.)

Lodge has an improvement of the receiving antenna linked through a transformer with a closed circuit containing a coherer, which circuit is not timed to the antenna circuit. The receiver circuit has in it also a variable coil $h^4$. By varying the number of turns in this coil, and hence its inductance, the receiver can be operated in electrical resonance, or tuned to a transmitting circuit.

For the purpose of furnishing a pure wave, Lodge provides that the energy undelivered to the radiating circuit be cut off, and states, on page 2 of his patent, that "the advantage of this is the charges so communicated are left to oscillate free from any disturbance due to maintained connection with the source of electricity," and the maximum effect will be produced on the receiving circuit.

The operation of Lodge patent, Fig. 4, is identical with defendant's in using impulse charging and variable inductance coil in the antenna. No reservoir circuit is used, and, when the radiating circuit is charged, it is entirely separated from the source of supply circuit which necessarily has some natural period.

The Lodge receiver consists of a primary tuned antenna circuit, $h$, $h^4$, $h^1$; $h^4$, in its entirety, is the vertical wire or antenna, and $h^1$ is the ground connection. The antenna circuit is tuned to the distant transmitter. It is an oscillating circuit and its inductance and capacity values are so adjusted that its time period is that of the distant transmitting antenna, and the variation adjustment is made by variation of the coil $h^4$ as shown in Figure 13, receiver. Surrounding coil $h^4$ is a secondary coil, $u$, and connected to the terminals of this secondary coil in the simple series circuit, are the detector, which, as Lodge states (page 4 of his patent) "may be a single point contact" (coherer), and battery, $f$, and the indicator, $g$. The secondary circuit of the receiver is so associated or linked with the primary or receiving circuit that it does not in any way interfere or hinder the free oscillation of this receiving antenna. As stated by Lodge, "The idea being thus to leave the resonator free to vibrate electrically without disturbance from attached wires," this being the same as shown in the transmitter in the Lodge patent, Figure 4, the idea being to have one single free oscillating circuit at both the transmitter and the receiver. Since coil $h^4$ is magnetically linked with the secondary coil $u$, the oscillations induce simple oscillations in this coil $u$ and its attached circuit. The energy in the antenna circuit of the receiver is transferred to the secondary circuit, not by being timed or tuned to the primary or receiving antenna circuit, but by being magnetically linked therewith and induced or forced upon the secondary circuit when any alternating current flows through coil $h^4$ and a forced vibration by means of this vibration of circuits produced. There are no variable elements in the circuit, hence it cannot correspond in time period or tune with the primary circuit. Lodge gives further details as to the apparatus used in the secondary circuit of this receiver, coil $u$, indicator $g$, and the battery and detector, $f$, $e$, when he says:

"In all cases it is permissible, and sometimes desirable, to shunt the coils of telegraphic instruments by means of the resistance or capacity, as shown at $W$ in Figure 12."

The operator in the transmitting station shown in Figure 4 of G W P 14, would first connect to his transmitting series of power, $a$, its storage batteries, and adjust coils $h^4$, $h^4$, to such values as would tune the circuit to the period of operation corresponding with the distant receiving station with which he wished to communicate, and then operate the telephonic key, causing a short and long series of charging currents from coil $a$ to the supply circuit $h^6$, $h^8$, $J$, $J$, $h^8$, $h^7$, to flow into the radiating antenna, these impulses being dots and dashes of the Morse code, the operation of this key being an intermittent operation, the intermittances being simply those of the spark discharging at the starting gaps $h^{10}$, $h^{11}$. If the Rhumkorf coil or induction coil is employed, the sparks usually occur at the rate of 10 or 20 per second, and the intermittent series of charge currents will flow into the radiator $h$, $h^4$, $h^1$. These currents set up oscillations in the radiator corresponding in frequency to the tuning of the circuit to which it has been adjusted. If the distant receiving station hears a signal, it will answer, and so the operator at the transmitter of Figure 4 will "listen in." If the transmitting station is correctly adjusted to the tune of

the receiving circuit $h$, $h^4$, $h^1$, the passing wave trains will flow through coil $h^4$, force oscillations upon the secondary circuit, affect the coherer $R$ of the circuit, and will transmit the signals from the transmitting circuit, which will be received by the operator. If the signal is weak, the operators can bring the transmitter and receiver into closer tune or resonance. The primary purpose of Lodge seemed to be the removal of the detector and its effect from the receiving antenna. Because of its resistance, it prevented free oscillations of the antenna.

### PICKARD CHART

COMPARISON LODGE AND MARCONI PATENTS IN SUIT

| LODGE 1898 | MARCONI 1904 |
|---|---|
| No. 609,154 | No. 763,772 |

TRANSMITTER FIG. 4.    TRANSMITTER FIG. 1.

RECEIVER FIG. 13.
AND DESCRIPTION.    RECEIVER FIG. 2.

In G W P Chart 47 is made a comparison between the Lodge patent and the Marconi patents in suit, in which it is claimed that the receiver, Figure 13 of Lodge, is identical with the defendant's standard receiver. The inductance and capacity values in the antenna circuit are so adjusted that its time period is that of the transmitting antenna, the adjustment being made by the variation of coil $h^4$, which is surrounded by the secondary coil, $u$, and connected to the terminals of this secondary coil in a simple series circuit, first, the detector, $e$, being a single point coherer; second, a battery, $f$, and third, an indicator, $g$, the secondary circuit being so associated with the receiving antenna circuit that it does not in any way disturb the free oscillations, "the idea being thus to leave the resonator free to vibrate electrically without disturbance from attached wires." This arrangement is the same as the transmitter, Figure 4 in the Lodge patent, the idea being to leave the transmitting antenna or single oscillating circuit entirely free to vibrate without any disturbance from attached wires, and the same is carried through the entire system of transmitting and receiving. Such receiver is commercially operative, the efficiency of which has been demonstrated before the court. In the right-hand lower figure is shown the Marconi receiver. Both have a receiving circuit, $1$, containing adjustments for tuning to the wave length of the transmitter, a wide difference appearing in circuit $2$. In defendant's receiver, which is Figure 13 of the Lodge patent, there are no adjustments. A fixed coil, $u$, is connected in series with detector, $e$, battery, $f$, and indicator, $g$; whereas, in the Marconi patent, there are, in the secondary circuit, a series of adjustments, adjustable inductance $g^2$, capacity $h^1$, these being the adjustments by which the secondary circuit $2$ is operated in resonance or tune with circuit $1$. In the demonstration before the court, it was shown that it was necessary to make adjustments in the antenna or receiving circuit, and also to make adjustments of inductance and capacity in circuit No. $2$, while but one adjustment was made in the defendant's receiver, that being in circuit No. $1$. It is apparent that this receiver has but one tuned circuit, that being a fixed or nontunable circuit, while the plaintiff's receiver has two tuned circuits, the one being tuned to the other by independent adjustment.

Professor Fleming, in his book entitled "The Principles of Electric Wave Telegraphy" (1906 Ed.) page 218, in considering inductively coupled circuits such as Figure $1$ of the patent in suit, says:

"When two circuits, having inductance, resistance, and capacity, are inductively connected together, we are then presented with a unique case to consider, if their natural time periods of oscillations when separate are the same. Oscillations in one circuit then create a strong response in the other coupled circuit. In practice, we find that this syntony or agreement between the time periods of the two periods must be very exact, if the phenomenon of resonance is to take place."

In the same book (page 490):

"There are in fact only two modes of coupling an open and closed oscillatory circuit which have any technical value. First, we may couple together the circuits in such a manner that a single pure oscillation, or one single period of vibration, is forced upon the aerial or radiator, not its own natural period, but that of the actuating closed circuit. Secondly, we may couple to-

gether circuits which have the same free, natural period, when separate, and thus establish a syntonism between the circuits, which, under the condition of a somewhat 'loose coupling' results in the radiation of waves of two different wave lengths."

The tuned relation between the circuits behave as a pair of coupled pendulums, and their interference with each other would produce complex waves, or waves of different lengths, as would the interference of the swinging pendulums with each other produce complex oscillations.

Plaintiff's patent in suit states that any of the prior single circuit or two circuit receivers may be used with the transmitter of the patent, and also deals with a special form of receiver, in which the capacity and self-inductance of the two circuits are to be independently adjusted, so that the product of self-induction multiplied by the capacity will be the same in the two circuits. Means of independently varying their tune must be provided. In the prior patents, No. 627,650, Nos. 647,007–647,009, and No. 668,315, referred to, there are no such independent adjustments. In Marconi patent, No. 676,332, a variable inductance coil is shown in the primary or antenna circuit. While this patent was filed after the date of the filing of the patent in suit it corresponds, as stated in the first paragraph of its specifications, on page 1, to Marconi's British patent No. 5387, dated March 21, 1900, being before the filing of application for patent in suit, and which corresponds to the United States patent in issue here.

The question of efficiency or selectivity is not the issue. The issue is infringement. The plaintiff's receiver may be much more efficient and more highly selective, and yet these qualities, of themselves, would not show infringement. There is a distinction between efficiency and selectivity. Efficiency simply means the amount of energy delivered to the detector. The efficiency of a receiver is the energy available at the receiving station, in the form of passing waves, the amount of energy which is delivered to the detector from such waves. An efficient receiver is one which transmits the greatest amount of energy to the detector, and thereby gives the maximum effect to the indicator. Selectivity is the sharpness of response with reference to transmitting stations of different frequencies or wave lengths. A very selective receiver is one which differentiates sharply between two different transmitting stations having nearly the same wave length or frequency. Defendant's receiver does not include the essential elements of the plaintiff's receiver. The persistent oscillator, variable condenser, and variable inductance in the detector circuit, are all lacking. There is no relation to tuning.

[3] The mere fact that the same result is obtained by the operation of an apparatus is not conclusive of infringement. Infringement cannot be predicated on results obtained, irrespective of the apparatus employed. The fact that the apparatus of the plaintiff, by "*broad tuning*," and the apparatus of the defendant in normal operation, secure the same result, does not signify infringement (Goodyear Shoe Mach. Co. v. Spaulding [C. C.] 101 Fed. 990); the established rule being that the invention, if any exists, is because of apparatus by which the result is obtained, and not the mode of operation, independent of the

mechanical device used (Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 18 Sup. Ct. 707, 42 L. Ed. 1136). Results accomplished by mode of operation or function, separate from the means of mechanical devices, do not constitute infringement. Union Match Co. v. Diamond, 162 Fed. 148, 89 C. C. A. 172. The apparatus (Marconi) in suit is fundamentally different. The structures are different. The mode of operation is dissimilar. Because of such conclusion, it is not necessary to enter into any detailed discussion of the claims made in the plaintiff's patent, or double patenting, or any of the other issues raised. As to the apparatus furnished to the United States, this court, in view of the act of 1910 (Act June 25, 1910, c. 423, 36 Stat. 851 [Comp. Stat. 1913, § 9465]), has not jurisdiction, either over a suit for an injunction, or for an accounting. Foster Hose Supporter Co. v. Taylor, 191 Fed. 1003, 111 C. C. A. 667.

I think the prayer of the plaintiff should be denied, except as to the apparatus infringing the Lodge patent, for which an accounting is directed, and, unless the parties can agree as to the amount of damages, the matter will be referred to a special master to take testimony and report the same to the court, together with his findings and conclusions.